### CHARLES BORCHERLING'S executor

*v.*

### CHRISTINA TREFZ et al.

To taint a contract with usury it is not necessary that the illegal interest or bonus shall have been taken by the lender himself; but if it be shown that an illegal consideration was paid to some other person than the lender, pursuant to the terms of the contract of loan, with the knowledge of the lender, the contract must be declared to be usurious.

On final hearing on bill and answer and proofs taken in open court.

*Mr. Cortlandt Parker,* for complainant.

*Mr. Joseph Coult,* for defendant.

VAN FLEET, V. C.

This is a suit to foreclose a mortgage bearing date November 16th, 1874, made by the defendant's testator to the complainants' testator to secure $20,000.  The mortgage was payable in one year from its date, and bore interest at the rate of seven per cent. per annum.  The defence is usury.  It is undisputed that in the negotiation of the loan secured by the mortgage the mortgagee's son acted as the agent of his father, and, on the conclusion of the transaction, received from the mortgagor the sum of $5,000 in addition to $50 which the mortgagor paid him for making searches and drawing papers connected with the loan.  The mortgagor paid interest on the $20,000 at the rate of seven per cent. per annum, so that it will be seen that the sum which he actually received—$15,000—cost him, for the period for which by the terms of the papers the loan was to run, the enormous sum of forty-three per cent.  It is manifest that no honest business can be conducted successfully which purchases the use of money at such a price.  This fact of itself makes it the plain duty of the court, as it seems to me, to examine this transaction with the most jealous scrutiny, and to denounce it as highly illegal, unless it satisfactorily appears that the mortgagee was in no way responsible for this extraordinary exaction.  The design of the statutes against usury has been said to be to prevent avarice from preying upon necessity, but if this transaction must stand, and the device resorted to in this case to defeat the purpose of the law must be held to be beyond the reach of judicial correction, it is certain our law has not accomplished its purpose, and the evil it was intended to correct still exists in full vigor.

The following statement presents all the material facts attending the making and execution of the contract of loan:  The

mortgagor, through his book-keeper, applied to the mortgagee for a loan of $20,000, to be secured by mortgage; the mortgagee said he could make the loan, but in order to do so he would have to sell some of his securities, which he could only do at a great loss; to this the mortgagor's agent replied that if he would raise the money and make the loan the mortgagor would stand the loss. The mortgagee then said that his son was his agent, and that mortgagor's agent had better go and talk with him. The mortgagor and his book-keeper thereupon went to see the son and told him the object of their visit. The son said that he would see his father and talk with him about the loan. They subsequently saw the son again, when he told them that his father had the money, but that he (the son) had received an offer, from other parties, of $5,000, as commissions, for procuring a loan of $20,000; that he could get that from other parties, but if they were willing to pay the same sum they could have the money. At this time the mortgagor declined to take the loan on the terms proposed. Subsequently his necessities became so pressing that he was compelled to submit, and he accordingly sent his book-keeper to the son to notify him that he would take the money on the terms offered. The son furnished the money for the whole loan. He owed his father, for collections previously made, between $2,000 and $3,000. This he paid, and the father raised the balance by selling United States bonds to his son. The son says: "I had money on hand which I wanted to invest, and so I concluded to take father's bonds at their market value." The whole $20,000 was drawn from bank by the son and delivered to his father, and then passed back. $5,000 were drawn on November 17th, 1874. The whole of this sum was delivered to the mortgagor on the same day, and the bond and mortgage were, at the same time, delivered to the mortgagee. The mortgagor was required, on the same day, to sign a receipt, under seal, acknowledging the receipt of the $5,000. The remaining $15,000 were drawn on November 20th, 1874. The son, on the same day, delivered the money to his father, who at once laid it on a table in his son's office, at which his son, the mortgagor and the mortgagor's book-keeper were sitting. The mortgagor was

then required to sign another receipt, under seal, admitting the receipt of the $15,000, and stating that that sum, together with the $5,000 previously received, made up the amount of the mortgage. This paper, on being signed, was given to the mortgagee, who immediately left the room where the parties were, and the door between that room and the one into which the mortgagee went was closed. The $15,000 were then counted and $5,000 of it were handed over by the mortgagor to the son. The son says that his father got no part of this money and did not know that he received it; that his father knew that he was in the habit of getting commissions for procuring loans, but he did not know what they were. The son further says that he told the mortgagor, during the negotiation, that if the loan was made his fee would be $5,000, and that he stated as the grounds of his charge that the loan was a large one; that the security offered was not the first lien, and that he could get a fee of that amount from other parties. The property pledged for the payment of the loan was, in the judgment of the son, sufficient to render the money entirely safe. The person who got the $5,000 was the only child of his father, and is the person now before the court asking that a decree be made that the mortgage sought to be foreclosed is a valid lien for $20,000.

A charge of usury, whether made as the ground of affirmative relief or as a defence, always presents a question of fact, which, like other questions of fact, must be decided by the evidence. Under the statute in force at the time the contract under consideration was made, usury consisted in taking a higher rate of interest than that allowed by law, the prohibition of the statute being that no person should, upon any contract, take, directly or indirectly, more than $7 for the forbearance of $100 for one year. *Rev. p. 519.* The test question, therefore, in this case is, Is it proved that the lender took, directly or indirectly, on this loan, a higher rate of interest than that allowed by law? That a sum so far above that allowed by law was taken as to make the bargain an exceptionally oppressive one to the borrower, is a fact beyond dispute. But it is said that the $5,000 were not taken as interest or bonus, but were paid as compensation to the

lender's agent for services in inducing the lender to make the·
loan. This, in my judgment, is a plain abuse of language.
When money is given as compensation for services, the sum paid
must, in order to be fairly entitled to be called compensation,.
bear some relation to the value of the services rendered. In such
an affair as this it was not possible for any person, no matter how
great his skill or valuable his time, to earn, by any service which.
it was possible for him to render to the borrower, a sum at all
approaching in amount that which was paid. It is true that
where, as in this case, the principal is the agent's father, it is·
always within the agent's power to say to the borrower, " My·
principal has the money you want, but he will not let you have·
it unless I advise him to do so, and I will not so advise him.
unless you will give me, as a fee, the one-fourth of the sum you
desire to borrow." If the borrower yields to such a demand he
does not make compensation for services but gives a *douceur.*
In such a transaction the principal is entitled to the very best
skill and judgment his agent can give, and he also has a right
that his agent shall keep himself entirely free from the least
temptation to betray him. If in such a transaction an agent
clandestinely stipulates for the payment of a fee to himself as a
condition of advising the loan, his bargain, in my judgment, is a
corrupt one, and if he takes the fee he receives a bribe. No man
can, at the same time, serve two masters having different or con-
flicting interests. The evidence shows that this loan was under
negotiation between two and three weeks. Suppose we say that
the negotiations covered the longest period—three weeks—and
that the mortgagee's son devoted the whole of each day, Sundays
included, to argumentation to convince his father that he ought
to make the loan, the whole period of his service would then have
been twenty-one days, and his compensation at the rate of over
$230 a day. In a case where a charge, much less exorbitant in
amount, was made by a lender under the guise of compensation
for professional services, the court of errors and appeals, speak-
ing by Mr. Justice Dixon, declared that the assertion that the·
money was received as compensation for services was incredible,.
but it was quite manifest, on the contrary, that it was received as·

a usurious bonus.   And so the court adjudged the fact to be in spite of the lender's positive affirmation, under oath, to the contrary.   *Boyd* v. *Engelbrecht, 9 Stew. Eq. 612.*   It is manifestly idle to call the $5,000 compensation for services.   It was not paid as compensation for services, but for the loan.   It was paid for the money.   A payment for such a purpose contravenes the very foundation principle of the law against usury.

But it is said the illegal payment was not made to the mortgagee.   It is not necessary that it should have been, to infect the contract with usury.   There can be no doubt that if the mortgagee had made this contract in person, and it had been agreed that the mortgagor should, as a condition of the loan, pay to the mortgagee's son a fee of $5,000, the presence of that stipulation would have rendered the contract usurious.   If the thing forbidden by law is done, the law is violated, and it is wholly unimportant by what particular method the violation is effected, or who gets the fruit of its violation.   The thing the statute prohibits is the taking of more than a fixed rate of interest for the use of money.   The design of the statute is the protection of borrowers.   Now, it is manifest that the law is just as effectually violated and the harm to the borrower is just as great when the spoil goes to the pocket of a stranger as when it goes to the pocket of the lender.

The important question in cases of this kind is, Was the bonus or illegal interest taken, no matter by whom, pursuant to the terms of the contract of loan with the knowledge of the lender? If it was, the contract is usurious.   That it was in this case would seem to be almost incontestable.   It is undisputed here that the borrower first applied to the lender, that the lender said that he could make the loan, but to do so he would be compelled to sell his securities at a loss, and that the borrower replied that he would stand the loss.   At this point the lender sent the borrower to his son to arrange the terms of the contract.   The son and the borrower did arrange them, and one of them was that the borrower should pay the lender's son $5,000 for advising his father to make the loan.   In view of these facts, I think it is impossible to say that the lender did not send the borrower to his

son to have just such a contract entered into as the son after-wards made.  It will be remembered that the work of negotia-tion was almost complete ; the minds of the parties had met on all the material parts of the contract ; the lender had the money which the borrower wanted, or could readily raise it ; he was willing to make the loan, but he wanted something in addition to legal interest ; the borrower was willing to pay more than legal interest ; the lender's son was a lawyer, the lender was not ; and now, when they reach the point where it is necessary that a plan should be devised for the payment of more than legal inter-est for the money, the lender sends the borrower to his son.   To my mind it is clear that his object in doing so was to have the difficult part of the contract arranged.

Besides, it will be remembered that two of the reasons which the son urged in justification of this extraordinary charge, had special reference to his father.   They were just such reasons as a greedy lender, dealing in person, would present to the mind of an eager borrower.   The son says that he told the borrower that the loan was a large one and that the security offered was not a first lien.   These considerations were such, it will be observed, as concerned the lender principally, if not exclusively.   If the loan was made, the lender had to raise the money ; the labor and loss of doing so were his ; and if the security to be taken for the loan was insufficient or subject to any infirmity or disadvantage, the risk was the lender's.   Mere form of speech, in such a mat-ter, is wholly immaterial.   The son may, in this transaction, appear, if we look merely at the form of his speech, to have been speaking for himself, but if we look at the substance of what he said we must see that what he said was said for his father and not for himself.

That the contract actually made in this case required the bor-rower to pay more than legal interest is free from all doubt. But suppose we say that the contract in this respect was un-authorized, and that the lender never meant or consented that his agent should place himself in a position where he would be under a very powerful temptation to betray him, then the lender was bound, according to one of the best-established and most salutary

principles of the law of agency, as soon as the fact that his agent had transcended his authority and committed a fraud against him came to his knowledge, to repudiate the contract and disavow it *in toto*. The moment a principal obtains knowledge that his agent has, in pretending to deal for him, exceeded his authority, the law calls upon him to act. He cannot toy with the situation; he must either own or disown his agent's act, and he must do so *in toto;* he cannot ratify part and repudiate the rest. In the language of Judge Story, "He must adopt the whole or none. A ratification of part, with full knowledge of all the material circumstances, operates as a confirmation of the whole." *Story on Agency* § *250.* Now, while this is a well-established rule of almost universal application, I am obliged to add that it seems to be authoritatively decided that contracts of the class under consideration do not fall within its operation, but that a lender may, where his agent has, without his knowledge and against his will, stipulated for the payment of a bonus to himself as a condition of the loan, and where it satisfactorily appears that the lender was free from the least intention to violate or evade the law against usury, enforce that part of the contract which he intended should be made, and repudiate the rest. The leading case on this subject is *Condit* v. *Baldwin, 21 Barb. 181; S. C. on appeal, 21 N. Y. 219.* The doctrine established by this case has been followed in New York in *North.* v. *Sergeant, 33 Barb. 350; Fellows* v. *Commissioners of Oneida, 36 Barb. 655,* and *Bell* v. *Day, 32 N. Y. 165,* and by the court of errors and appeals of this state in *Muir* v. *Newark Savings. Institution, 1 C. E. Gr. 537.* This doctrine was not adopted by the court of appeals of New York without a struggle, and since its adoption it seems to have been conceded that its soundness could not be defended, but it was adhered to in *Bell* v. *Day* simply on the ground that it was better that the law on such a subject should be considered settled than that it should be settled exactly in conformity to correct principles. In the case last mentioned, a majority of the judges who heard it were convinced that the doctrine was unsound, but two of them—Chief-Judge Denio and Judge John K. Porter—nevertheless voted to adhere to it on the

ground of *stare decisis*, and it was thus maintained. But the law, so far as this court is concerned, must be considered settled.

The rule, then, to be applied in the solution of the case, under the view last stated, is this: If the $5,000 were taken without the knowledge and against the will of the lender, he, notwithstanding the fact that the contract of loan was in fact usurious, is not affected by its illegality, and may enforce his mortgage; but if, on the contrary, the $5,000 were taken with his knowledge, then he was a participant in the illegal exaction and should be required to bear its penal consequences. The proofs leave little room for doubt that the lender knew, before he advanced the money, that a bonus was to be paid for the loan. The son says that his father knew that he was in the habit of charging fees or commissions for procuring loans, but that his father did not know how much he received in this case. He does not, however, say that he did not tell his father how much he was to receive. When the lender and borrower suspended their negotiations and the lender sent the borrower to his son, it will be remembered that the only part of the contract which was incomplete was that which should provide a method by which the lender should be re-imbursed for the loss he would sustain on the sale of his securities. The son made that part of the contract. Did not the father want to know what it was? Would he ever have consented to make the loan until he knew? Or suppose we say that the father's intention, when he sent the borrower to his son, was that his son should negotiate the whole contract, arrange all its parts, still it would be necessary for him, in order to raise the money, to sell his securities and thus incur a loss, and he would,

NOTE.—How far a lender is affected by the acts of his agent in taking usury from the borrower, see *Gray* v. *Van Blarcom*, 2 *Stew. Eq.* 454; *Forbes* v. *Baeder*, 4 *Stew. Eq.* 381; *Coudert* v. *Flagg*, 4 *Stew. Eq.* 394; *Rogers* v. *Buckingham*, 33 *Conn.* 81; *Lee* v. *Chadsey*, 3 *Abb. App. Dec.* 43; *Phillips* v. *Mackellar*, 92 *N. Y.* 34; *Fellows* v. *Longyor*, 91 *N. Y.* 324; *Ballinger* v. *Bourland*, 87 *Ill.* 513; *Boylston* v. *Bain*, 90 *Ill.* 283; *Payne* v. *Newcomb*, 100 *Ill.* 611; *Meers* v. *Stevens*, 106 *Ill.* 549; *Brigham* v. *Myers*, 51 *Iowa* 397; *Dickey* v. *Brown*, 56 *Iowa* 426; *Erickson* v. *Bell*, 53 *Iowa* 627; *Acheson* v. *Chase*, 28 *Minn.* 211; *Jordan* v. *Humphrey*, 31 *Minn.* 495; *New England Mortgage Co.* v. *Hendrickson*, 13 *Neb.* 157; *Austin* v. *Harington*, 28 *Vt.* 130; *Outillie* v. *Wœchter*, 33 *Wis.* 252; *Palmer* v. *Call*, 7 *Fed. Rep.* 737.—REP.

therefore, still be in a position where he would be naturally anxious to know how he was to be re-imbursed, and unwilling to furnish the money until he had satisfactory information on that subject.   There can be no doubt that he knew.   His own conduct furnishes very strong evidence on this point.   There is no dispute in the evidence that immediately after the father laid the last $15,000 of the loan on his son's table he left the room where the business was being transacted and went into the adjoining room, and that the door between the two rooms was closed.   The mortgagor's book-keeper says that the father remained in the adjoining room until the business was completed, and that he found him there when he went out; while the son says that he did not see his father again after he left the room until near the close of the day.   There is no dispute, however, that he left. Now, why did he leave?   His son, it is true, was there to represent him and to do for him whatever was necessary to be done; but an important contract involving $20,000, to which he was a party, was in course of execution and at its most interesting point—at the point where the money was to be handed over and the securities delivered and the final words spoken; he had no business or duty which called him elsewhere; he had a right to be in the room where the business was being transacted; his interest, as well as his curiosity, would naturally make him desire to be there; but he went away, and as soon as he was placed in a position where he could neither see nor hear what was done, one-fourth of the sum secured by the mortgage he had just taken was paid to his son as a fee for advising him to make the loan.   Can there be a doubt in the mind of any person at all familiar with the motives which control human conduct why he went away?   I have none.

The proofs convince me that the contract on which the mortgage sought to be foreclosed is founded, was usurious, and therefore the defence must prevail.